In re Barbara WILLIS, Debtor.

Barbara WILLIS, Plaintiff,

v.

The NORTH FORK BANK & TRUST COMPANY; Sherry Egan Bitz; Stefan Szwarce; New York State Commission; "John Does" and "Jane Does" (the name of the last two defendants being fictitious, and unknown, to plaintiff, being intended to designate tenants or persons in actual or supposed occupation of the mortgaged premises or persons having or claiming some interest therein), Defendants.

Bankruptcy No. 086–60070–21.
Adv. No. 086–0024–21.

United States Bankruptcy Court,
E.D. New York.

Sept. 29, 1986.

Jules V. Speciner, Great Neck, N.Y., for plaintiff-debtor.

Conforti, Gordon, Reale & Shenn by Anthony T. Conforti, Riverhead, N.Y., for defendant Szwarce.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

What is involved here are the rights, if any, of the defendant, Stefan Szwarce, to certain property, titled in the debtors, Barbara Willis and Kato Restaurant, Inc., when both filed under Chapter 11. It is the defendant's position that he is entitled to specific performance of a settlement agreement made on August 6, 1984, which committed Willis to transfer the property to him. For the reasons which follow, this Court has concluded that he is not so entitled and that he has no interest in the property in question.

### The Procedural Background

On January 31, 1986, Barbara Willis filed a petition for relief under Chapter 11 of Title 11 of the United States Code. Willis has remained in possession of her assets as a debtor-in-possession, no trustee having been appointed.

Willis is the President, sole director and 95 percent shareholder of Kato Restaurant, Inc., d/b/a Cato's ("Kato"), which likewise filed under Chapter 11 on January 31, 1986 (Case No. 086-60069-21).

At the time of the filing of the petitions, Willis was the record owner of real property located on School Street, Bridgehampton, New York (the "School Street property"). A two-story wood frame structure on this property was utilized by Kato in the operation of its restaurant business.

Willis brought this adversary proceeding on March 14, 1986, seeking authorization to sell the School Street property free and clear of liens and encumbrances pursuant to Sections 363(f)(3) and (4), and 506(c) of the Bankruptcy Code. An answer to the complaint was filed by Stefan Szwarce, who had previously moved in both the *Willis* and *Kato* cases to modify the automatic stay imposed under § 362 of the Bankruptcy Code to permit him to continue certain pending state court litigation against Willis. He also sought in both *Willis* and *Kato* an order "staying the Debtor from

selling any assets subject to a determination of the Szwarce claim".

On April 22, 1986, a hearing was held on joint notice in both the *Willis* and *Kato* cases with respect to a joint sale of the School Street property owned by Willis and the personal property pertaining to the restaurant owned by Kato. As a result of the hearing, a sale of the School Street real property in the sum of $395,000 and of the Kato personal property for $75,000 was approved subject to a determination of the claims of Szwarce.

At that hearing, on consent of the parties, it was agreed that the issues in the Szwarce's state court action would be tried and determined by the Bankruptcy Court. In effect, the state court action was removed to the Bankruptcy Court pursuant to Bankruptcy Rule 9027 and the consent of the parties.

Because of the subject matter of this proceeding, the Court has jurisdiction to hear and determine it pursuant to 28 U.S.C. § 157(b). It is a core proceeding.

## FINDINGS OF FACT

### The Properties Involved

1. In August, 1984, the plaintiff, Barbara Willis was the owner of record of two pieces of real property located in Bridgehampton, New York: a residence on Montauk Highway (the "Montauk Highway property") and a commercial property on School Street, the School Street property.

2. The School Street property was the subject of split zoning, only the front 6,166 square feet (Parcel A) being zoned for business. This part contained a two-story building, the first floor of which housed a restaurant and the second floor of which was leased as a residence. The back piece, (Parcel B), comprised 6,549 square feet and contained a two-car detached garage and a one-story, vacant residence in a neglected condition. (PX 15, 20).

3. The restaurant, which was known as Cato's, was operated by a New York corporation, Kato Restaurant, Inc. ("Kato"), of which Barbara Willis was 95 percent stockholder and President. Cato's was a season-

al business, which derived its maximum profits from Memorial Day through Labor Day. (Tr. 6/13/86, p. 81, 118; PX 9). After Labor Day, the restaurant would get behind on its bills and customarily closed in January for a month or two. (Tr. 6/13/86, pp. 81–84).

4. Prior to May, 1983, Willis had little to do with the day-to-day operations of the restaurant, which was managed and supervised by the defendant, Stefan Szwarce. (Tr. 6/11/86, p. 126, 158).

5. On August 6, 1984, both properties owned by Willis were heavily encumbered, all encumbrances having been created to provide financing for Cato's, with the exception of a $35,000 first mortgage held by the Bridgehampton Bank on the Montauk Highway property. The School Street property was encumbered by a first mortgage in favor of North Fork Bank and Trust Company ("North Fork") in the approximate amount of $152,883.31 and a second mortgage in the approximate amount of $38,863.97 in favor of one Sherry Egan Bitz. As collateral for a loan made to Kato, Barbara Willis had placed a second mortgage on the Montauk Highway property in favor of a group of investors represented by Samuel D. Brill, which stood at $63,541.72 in August, 1984. A third mortgage of $50,000 on the same property had been given North Fork as additional collateral on its loan to Kato. (PX 17; DX's C, H; Tr. 6/13/86, pp. 54–58, 155; Stipulation annexed as Ex. A to Defendant's Answer, hereinafter "Stipulation").

6. Kato had other obligations in addition. George Stavropoulos was owed $16,500 in connection with a guaranty he had given North Fork (Tr. 6/13/86, pp. 102–104); One-Way Supply, Corp., which supplied Kato with everything but food, was owed at least $14,000 (Tr. 6/13/86, pp. 134–135); and sales and withholding taxes were owed. (Tr. 6/13/86, pp. 57–58; Stipulation).

### The Stipulation Settling the First Lawsuit

7. On or around May 27, 1983, Szwarce sued Willis in the Supreme Court of the

State of New York, County of Suffolk, (a) to rescind an agreement entered into between them on March 18, 1983 defining their respective rights in various properties, and (b) to impose a constructive trust in his favor on the School Street property and the shares of stock in Kato held by Willis. (Ex. B to Defendant's Answer).

8. Incidental to this lawsuit, Szwarce filed a *lis pendens* against Willis' Montauk Highway property, which blocked execution of a contract of sale into which she had earlier entered. (Tr. 6/11/86, p. 112; Tr. 6/13/86, pp. 147–148).

9. When Szwarce's complaint came up for trial on August 6, 1984, it was settled after a lengthy conference in Judge Paul Baisley's Chambers, by a stipulation placed on the record by Anthony Conforti, Esq., attorney for Szwarce. (Stipulation).

10. Under the terms of the Stipulation, the restaurant business and the School Street real property were to be transferred to Szwarce, who in return was to relieve Barbara Willis and her Montauk Highway property of responsibility for all, or virtually all, the debts generated by the restaurant. (PX 17).

11. It was stipulated that the *lis pendens* against the residence was to be lifted.

12. Szwarce agreed to relieve the Montauk Highway property and Willis personally of all liability for the Brill and North Fork mortgages. She was also to be relieved of any personal liability for the North Fork and Egan Bitz mortgages on the School Street property.

13. Szwarce also agreed to "assume the obligation of paying and have [Willis] released from any personal liability on account of a note in the approximate sum of $14,000 held by One-Way Supply".

14. With respect to the outstanding sales and withholding taxes, it was agreed that Szwarce would execute and deliver to Willis a guaranty of these obligations, incurred up to May 7, 1983, not to exceed $20,000, to be "secured by a subordinate mortgage on the School Street real property and shall be subordinate only in principal

sum to the mortgages existing at the date of closing". Judge Baisley added by way of clarification: "Which shall not exceed in total amount the amount of mortgages that are presently on the property". Mr. Conforti agreed.

15. In return for performance of these undertakings by Szwarce, the School Street property and the personal property belonging to Kato were to be transferred to him, subject only to the claims of North Fork, Egan Bitz, Stavropoulos and One-Way Supply.

16. Until this transfer took place, the Stipulation required Willis to "keep current all mortgages on the various parcels of property" and "entitled [her] to receive any of the profits generated by the restaurant business".

17. With respect to the time of performance, Conforti stated: "The plaintiff shall have 45 days in which to make these arrangements". He later added: "The plaintiff shall have 45 days to perform in accordance with this stipulation. If the plaintiff fails to perform within 45 days, upon notice submitted by either side, this matter [i.e., the state court action to impose a constructive trust] may be restored to the trial calendar".

18. The 45 day period expired September 20, 1984. The period was fixed in view of the fact that the business season for the restaurant would end Labor Day and thereafter drop off steadily. (Tr. 6/13/86, pp. 117–118).

19. One of the terms of the Stipulation was that all communications between Willis and Szwarce would take place only through their attorneys.

20. Judge Baisley reserved jurisdiction for the purpose of resolving any remaining disputes regarding the division of personal property.

*The Post-Stipulation Period*

21. On August 17, 1984, Conforti authorized Willis' attorney, Thomas Twomey, Jr., to enter an order releasing the *lis pendens* placed by Szwarce against the Montauk

Highway property. (DX N) Willis, however, delayed consummating the sale of that property pending release of the premises from the mortgages held by North Fork and Brill, as promised by Szwarce.

22. Because Szwarce was "penniless", except for some "art work", Jeanette Dupee, who had worked for Kato from 1979 until May, 1983, and with whom Szwarce was then living, undertook to secure financing to carry out the Stipulation. (Tr. 6/13/86, p. 11).

23. On September 18, 1984, Conforti, acting as attorney for Dupee, submitted an application to the Peconic Bank for a $250,-000, 20 year, SBA guaranteed loan to be used for purchase of the School Street property and Cato's by Stefan Restaurant Corp., a newly formed corporation, all the stock of which was owned by Dupee. (PX's 1, 2, 3, 4; Tr. 6/11/86, pp. 27, 38–41, 128–129).

24. The application was supported by several documents, including a personal history of Dupee, showing employment principally as a waitress during the prior 16 years (PX 8) and a financial statement showing local liquid assets of $35,000 and an annual income of $25,000. (Tr. 6/11/86, pp. 57–62, 138; PX 4; see also DX's M, R, S). (The defendant also offered evidence intended to establish ownership in Dupee in 1983 of bearer bonds of a total value of $15,138.67 not included in her 1984 financial statement. (Tr. 6/11/86, pp. 134–138; DX's T, U). The evidence was unpersuasive as to Dupee's assets in August, 1984.)

25. Approximately one month later, on October 16, 1984, Szwarce entered into a contract with Dupee and Stefan Restaurant Corp. to sell them the School Street property and all personal property on the premises for an agreed price of $250,000. (DX F).

26. The Peconic Bank arranged to have the School Street property appraised. (Tr. 6/11/86, p. 28) The appraisal encompassed the entire site, including the vacant and neglected residence at the rear of the property, of which it included pictures. Using the income approach and relying solely on the income generated by the restaurant building in Part A, the appraiser concluded that the property had a value of $337,000. (PX 20).

27. On October 24, 1984, approval of the $250,000 loan application was recommended to Peconic's Discount Committee by its loan officer. (Px's 1, 7). The collateral was described as "Mortgage on restaurant (value $337.0) and Southampton property (value $85.0)". (It is the practice of the Peconic Bank to omit the last two zeros when writing numbers in the thousands.) The loan was approved. (PX 1).

28. On November 26, 1984, the loan documents were forwarded to the SBA. The collateral was described as first mortgage on restaurant building appraised at $337,-000. On December 3rd, the SBA informally advised the Peconic Bank that it would guarantee a loan of $250,000 to Stefan Restaurant Corp. by the Peconic Bank. (PX 1).

29. Around December 7, 1984, the SBA forwarded to the Peconic Bank an "Authorization and Loan Agreement" agreeing to guarantee a loan of $250,000 to Stefan Restaurant Corp. (DX E).

30. The agreement (DX E) called for the SBA to receive as collateral a first mortgage on the "land and building located at School Street", plus a first security interest in all machinery, equipment, furniture and fixtures, all accounts receivable, and all inventory now owned by the borrower, or thereafter acquired. (Tr. 6/11/86, pp. 32–33). It was also to receive a second mortgage on another piece of real property owned by Dupee.

31. The agreement (DX E) also contained a number of conditions. One was that prior to any disbursement of the loan, the lender was to be in receipt of evidence that Jeanette Dupee has injected not less than $53,000 into the business, either as capital or as a loan. Further, the borrower was not to assume any liabilities or encumbrances from the previous operator of the restaurant. (Tr. 6/11/86, p. 33).

32. Following the receipt of this document, the Peconic Bank sent it to Conforti

for Dupee to review and sign, thereby indicating her agreement and acceptance. (PX 1). She never returned an executed copy of the document to the Peconic Bank, nor was Szwarce ever advised of any commitment by the Peconic Bank to make the requested loan. (Tr. 6/13/86, pp. 29, 35).

33. The $250,000 loan was never made. On April 23, 1985, the Peconic Bank advised the SBA that the application of Stefan Restaurant Corp. was being withdrawn, and that the corporation was not paying the fee of $2,125, due March 31, 1985. (PX 1; Tr. 6/11/86, p. 35). The loan could have been reactivated. (Tr. 6/11/86, p. 36).

34. While the negotiations with Peconic Bank and the SBA for a $250,000 loan to Dupee and Stefan Restaurant Corp. were pending, Szwarce struck a deal on behalf of Stefan Restaurant Corp. with Stavropoulos and Bitz. On November 5th, Stavropoulos agreed to purchase from Stefan Restaurant Corp. the back portion of the School Street property for a total price of $53,500, to be paid by assuming a first mortgage (the Egan Bitz mortgage) for approximately $46,000 and giving a second mortgage for the balance of the purchase price in the approximate amount of $6,500 to the seller. (DX G) In addition, Stavropoulos agreed to treat the $16,500 owed him by Willis as guarantor on the debt held by North Fork as satisfied, if that debt were paid in full. (DX G; Tr. 6/11/86, pp. 144–145; Tr. 6/13/86, p. 68). For her part, Egan Bitz agreed to accept a first mortgage on the back portion in exchange for her existing second mortgage on the entire property. (Tr. 6/11/86, pp. 98–109) The necessary documents were still being drafted in January, 1985. (DX Q).

35. The Stefan Restaurant Corp. contract was not shown to the SBA. (Tr. 6/11/86, pp. 75–76) The SBA was not asked to agree, nor did it agree, to limit the first mortgage it was to receive as collateral on the School Street property to the front half.

36. Szwarce, at no time prior to May 3, 1985, was in possession, or control, of the funds necessary to satisfy the obligation owed One-Way Supply. He testified that he did not intend to use any part of the $250,000 he was to receive from the sale to Stefan Restaurant Corp. and Dupee for that purpose. (Tr. 6/13/86, pp. 68–69).

37. Willis was not kept informed of what, if anything, Szwarce was doing to carry out the Stipulation. Not until January, 1985 was even her attorney informed that a mortgage commitment had been secured and even at that late date Szwarce refused to allow her to see it. (Tr. 6/13/86, p. 122; DX W). From September on, she was led to believe that a closing was imminent, and acting on that belief, reluctantly granted Szwarce three extensions. (DX C) As required by the Stipulation, she continued operating the restaurant and paying the various mortgages on the two properties.

38. On September 25, 1984, her attorney wrote Conforti that Willis wanted certain information in order to decide whether to extend the time for performance. (PX 14) The time had expired September 20th. Specifically she wanted to know the amount of the loan being negotiated from the Peconic Bank. This was important because it had been stipulated that to guarantee that the pre–1983 taxes would be paid she was to receive a mortgage on the School Street property subject only to prior liens of not more than approximately $200,000. If the Peconic Bank was to be given a first mortgage in excess of that figure, this term of the Stipulation could not be met.

39. There is no evidence that her inquiry was answered prior to October 24, 1984, on which date Conforti wrote Willis' attorney that the application to the Peconic Bank was "for a SBA insured loan in a principal sum equal to the outstanding balances on the North Fork Bank mortgage plus the Shirley [sic] Egan mortgage". (DX K) This was incorrect. These two balances at the time totalled not more than $205,000, whereas the application to the Peconic Bank, which had been prepared and submitted by Conforti, was for $250,000.

40. On October 23, 1984, Twomey wrote Conforti that sale of the Montauk Highway residence was then scheduled to take place on October 29th. (DX J) He reminded Conforti that he had earlier advised Twomey that "at the time of this closing, the North Fork and Brill mortgages would be released of record as against this property in order to effectuate the terms of the Stipulation of Settlement". He asked to be advised if Szwarce would be able to carry out the Stipulation within this time frame. *Ibid.*

41. On October 26, 1984, after Conforti had advised Twomey on October 24th (DX K) that Szwarce would be unable to close by October 29th, Twomey wrote Conforti that the Montauk Highway property would be sold on November 2. (DX L) In light of this development, Twomey requested to have the Stipulation amended to ensure that Willis at the closing on the restaurant would be reimbursed for the mortgage payments she was making and the mortgages she would be satisfying. Also, Willis wanted "the sum of $20,000 to be placed in escrow with Twomey, Latham & Shea to be used to satisfy the IRS/sales tax contingent personal liabilities". (DX L). The amended stipulation would require the closing to take place on or before November 15, 1984.

42. This same letter of October 26th also requested the return of a 1979 Jeep pick-up truck belonging to Kato. (DX L).

43. The Jeep had been taken by Szwarce in 1983, transferred to Dupee and then sold, allegedly on her behalf, for $6,000 to an unidentified buyer in March, 1984. To effect the transfer of title, Szwarce signed Willis' name to the Certificate of Title. (Tr. 6/11/86, pp. 171–176; Tr. 6/13/86, pp. 17–23, 115–116). The record does not reflect any response to the request for the return of the Jeep.

44. No amended stipulation was ever received from Conforti. (Tr. 6/13/86, pp. 148–149).

45. On November 2, 1984, Willis sold the Montauk Highway property, still encumbered by the mortgages in favor of North Fork and Brill, of which Szwarce was supposed to relieve her. Willis paid both mortgages, totalling $113,541, out of the proceeds. (DX C) She also paid the purchasers $8,582 which she owed under the terms of the contract of sale for the delay in closing. (DX D, pp. 7–8) In consequence, she was left with less than $4,000 from the sale. (Tr. 6/13/86, p. 120; DX C).

46. Despite the fact that execution of the Stipulation in accordance with its terms was no longer possible, Willis' attorney on November 15, 1984 wrote Conforti that Willis agreed to "one further extension of the closing date provided for in the stipulation entered into the above litigation to and including November 21, 1984". (PX 16)

47. On November 28, 1984, One-Way Supply, whose debt was supposed to be paid by Szwarce, sued Kato and Willis for approximately $25,000. (DX V; Tr. 6/13/86, pp. 69–71, 133–136) The debt to One-Way Supply had increased due to the operation of the restaurant in the off-season period, as required by the Stipulation. (Tr. 6/13/86, pp. 133–136) Willis incurred expenses in defending and settling this litigation. (DX C–5; Tr. 6/13/86, p. 123)

48. By December, 1984, the total trade debts of Kato, due in part to continued operations of the restaurant after the season was over, was approximately $55,000. (Tr. 6/13/86, pp. 123–124)

49. Although Willis, after November 21, 1984, deemed the Stipulation to have expired, she remained agreeable to its performance provided Szwarce put her in as good a position as she would have been had the closing occurred at the time agreed. (Tr. 6/13/86, p. 121; DX D) She wanted to be reimbursed the payments she had made in October, November and December on the mortgages of which Szwarce was supposed to relieve her. The monthly payments of the North Fork and Egan Bitz mortgages ran $3,100 a month, consisting principally of interest. (Tr. 6/13/86, p. 144; DX M).

50. On January 16, 1985, Conforti wrote Willis' attorney flatly refusing to make good the interest which Willis had paid on the various mortgages subsequent to August 6, 1984. (DX W) The letter continues:

[ ] my client stands ready to abide by the terms of the Stipulation so long as proofs attended concerning the reduced principal sums of the Brill, North Fork and Egan mortgages, and also copies of the tax returns and payment remittances in connection with sales taxes accruing for the premises until May of 1983 are also produced.

\* \* \* \* \* \*

I would suggest that the parties get together for a meeting some evening next week, since I am scheduled to begin a trial on Monday. If your client is not interested, please advise me and I would stipulate with Mr. Alexander to restore this matter to the calendar for determination by Judge Baisley. (DX W)

Willis refused to attend the suggested meeting. (Tr. 6/11/86, p. 129).

51. To Szwarce's knowledge, Conforti never gave written notice to Willis' attorney that he was ready to close and set a date. (Tr. 6/13/86, p. 98) Willis corroborated that no closing date was ever set. (Tr. 6/11/86, pp. 121–124)

52. Because of the failure of the closing to take place as agreed, Willis lost the tax benefits of a capital loss to offset the capital gain on her residence. (Tr. 6/13/86, pp. 145–147; DX C). She also lost the interest she would have earned on the proceeds provided for in the Stipulation. (DX C).

*The Renewal of Litigation*

53. Neither side served notice to restore the original action to the trial calendar as provided in the Stipulation. Instead, on February 15th, Conforti moved by Order to Show Cause to compel Barbara Willis to comply with the Stipulation entered into on August 6th. (PX 18) The motion was denied on April 15, 1985 without prejudice to the right of either party to initiate a

plenary suit to enforce their respective rights, if any. (PX 19)

54. On May 3, 1985, Szwarce brought the plenary suit, now before this Court, demanding specific performance and asking the Court to amend the Stipulation by setting a new time of performance. (DX A) Willis filed a general denial to this complaint. (DX B).

55. On May 1, 1986, American Mortgage and Loan Association committed itself to lend Szwarce $255,000 to be secured by a first mortgage on the front half of the School Street property. (DX O; Tr. 6/11/86, pp. 11–25) The present value of the real estate justifies the loan. (Tr. 6/11/86, pp. 22–23) Stavropoulos still wants the back half of the property. (Tr. 6/13/86, p. 15)

55. Performance today would not give Willis value equivalent to performance within the time originally fixed by the Stipulation, or as extended.

## DISCUSSION

To prevail in this lawsuit, Szwarce must prove the tender of performance and refusal of such tender prior to May 5, 1985, or must prove that he was excused in some way by Willis from tendering performance. Because the parties, Willis and Szwarce, were prohibited by the terms of the Stipulation from communicating directly with one another, and because all their communications were carried on by their attorneys, the only two persons who have firsthand knowledge of what tender Szwarce made, or did not make, or what other communications were had, are Twomey, Willis' attorney, and Conforti, Szwarce's attorney. Neither took the stand. Conforti elected to act as counsel for Szwarce in this lawsuit, rather than appear as a witness, and Twomey was not called by either side. Therefore, the critical facts have to be gathered from the few pieces of correspondence between counsel that have been introduced into the record, and from hearsay—what Szwarce and Dupee recall being told by Conforti, and what Willis remembers learning from Twomey.

Not only does most of the evidence consist of hearsay, but neither Szwarce nor Dupee were credible witnesses. They fenced with their cross-examining interlocutor, equivocated and, when all else failed, pleaded loss of memory. Their few direct answers were, for the most part, unbelievable.

Willis, on the other hand, made a most favorable impression. She was nervous, but truthful.

"A party who seeks specific performance must prove that he has substantially performed his contractual obligations or tendered performance within the time specified in the agreement, or within reasonable time thereafter, that he is ready, willing and able to perform the contractual obligations not yet performed and not waived by the defendant ..." *Hadcock Motors, Inc. v. Metzger*, 92 A.D.2d 1, 4–5, 459 N.Y. S.2d 634, 636–637 (4th Dept.1983), citing 55 N.Y.Jur., Specific Performance, Sections 4, 25.

Since it is self-evident that the SBA loan, without which Szwarce could not even have come within hailing distance of performance, was not approved until, at the earliest, December 3, 1984, whereas the 45 days originally stipulated for performance expired September 20, 1984, Szwarce argues forcefully that time was not of the essence. The contention is largely academic, however, since Scwarce has failed to establish either that he was prepared to perform *at any time* prior to the time he filed his present complaint, May 3, 1985, or that he tendered such performance.

To begin with, Szwarce could not have hoped to satisfy the Stipulation without the SBA loan, but the documents necessary to make the loan a reality were never executed and it is doubtful whether the conditions laid down by the SBA could have been met.

There is no evidence that Dupee had available to her the means to inject not less than $53,000 into the business, either as capital or as a loan. Dupee's financial statement submitted to the Peconic Bank in August, 1984 shows liquid assets of no more than $35,000. Furthermore, Szwarce's reference to Dupee's mother as a possible supplementary source of the $14,000 needed to satisfy the debt owed One-Way Supply (Tr. 6/13/86, p. 69) scarcely indicates much confidence in the resources of Mrs. Dupee. What he said was "If I couldn't come up with enough money, Mrs. Dupee said she could probably get her mother to help out. Her mother offered to help with anything that we needed". *Ibid.*

Szwarce's contention that the $53,000 price named in the Stavropoulos contract with Stefan Restaurant Corp. would have satisfied the SBA's requirement of a cash investment of not less than $53,000 by Dupee is unpersuasive, despite its support by Peconic's ex-loan officer. (Tr. 6/11/86, pp. 33–34; 142–143). First, the sale to Stavropoulos was to be made by Stefan Restaurant Corp., not Jeanette Dupee, so that the proceeds of the sale would not have gone to Dupee; second, the sale would have yielded no cash to use as working capital, what Stavropoulos agreed to do was (a) to assume a mortgage in the amount of $46,000 owed to Bitz, (b) to give a second mortgage for an amount necessary to bring the recited purchase price up to $53,500 and (c) to forgive $16,500 owed by Willis; third, the agreement with Stavropoulos (unlike the proposed payment of the Brill mortgage by Szwarce out of the monies to be paid him by Stefan Restaurant Corp.) appears to conflict with another condition of the SBA loan, i.e., that the borrower, Stefan Restaurant Corp., not assume any liabilities or encumbrances from the previous operator of the restaurant. When Stefan Restaurant Corp. (the borrower) accepted the assumption by Stavropoulos of the obligation to pay the Bitz mortgage, an encumbrance owed by Kato, as the equivalent of the payment to it of $46,000, it necessarily was first assuming the mortgage as its own liability.[1]

1. The attorney for Willis also questions whether, in view of the $55,000 in outstanding trade debt, Szwarce could have satisfied the requirement that the SBA be given a first security

Not only is it questionable whether the conditions for the extension of the SBA loan could have been satisfied, but it is doubtful whether the agreement with Stavropoulos was consistent with SBA's requirement that it receive as collateral a first mortgage on the land and building located at School Street, Montauk Highway. If the back piece of the School Street property was sold to Stavropoulos, there is no way that the SBA could have been given a first lien on the entire property. Szwarce maintains that despite the fact that the appraisal covered the entire plot, that both the Peconic Bank and the SBA were aware of the sale of the back piece to Stavropoulos and did not object to it. No one so testified. The back piece to be transferred to Stavropoulos represented more than 50 percent of the total School Street property and was included in the $337,000 appraisal by description and photographs. The Court thinks it most unlikely that the SBA would have accepted a lien on only half the property which it had been told would collateralize a $250,000 loan made a shell corporation by a woman with limited earning power and assets.

Assuming, however, that Stefan Restaurant Corp. and Dupee could have qualified for the SBA loan, could have met the conditions laid down by the SBA, and persuaded the SBA to take a mortgage on half the real estate rather than the whole, Szwarce would still have not been in a position to satisfy the conditions of the Stipulation. To do that, he needed to pay off the debt to One-Way Supply and assure Willis that outstanding taxes would be paid. Under the terms of the Stipulation, Szwarce was obligated to deliver to Willis a guaranty of sales taxes and withholding tax obligations, not to exceed $20,000, incurred up to and including May, 1983, to be secured by a subordinate mortgage on the School Street property subordinate only in principal sum

to the mortgages existing as of the date of closing. As of the date of closing, those mortgages totalled $205,000. The mortgage which the SBA was to get of $250,000 would exceed the pre-existing mortgages by $45,000 and thereby make it impossible for Szwarce to give Willis the collateral ensuring payment of pre-existing tax obligations to which he had agreed.

In this court, Szwarce suggests that he was excused from furnishing Willis the second mortgage, to which he had agreed, by her willingness to accept a $20,000 escrow fund in its stead. A letter dated October 26, 1984 from Twomey to Conforti states that she was willing to agree to such an escrow fund as part of a global renegotiation of the terms of the Stipulation which would have made her whole for the delay in its execution. But there is no evidence that Szwarce, for his part, ever offered to put $20,000 in escrow and it is clear that the renegotiated Stipulation she requested was never forthcoming.

Conforti's letter of January 16, 1985 is inconsistent with his present claim that Willis' suggestion of an escrow fund had been accepted. What it says is that "[ ] my client stands ready to abide by the terms of the stipulation so long as ... copies of tax returns and payment remittances in connection with sales taxes accruing for the premises until May of 1983 are also produced." (DX W). But the escrow fund was not part of the terms of the Stipulation. Thus, as late as January 16, 1985, Szwarce was taking the position that he was going to carry out the terms of the Stipulation as originally agreed, although he had already disabled himself from doing so by participating in negotiations to put a $250,000 first mortgage on the property.

Parenthetically, it was not part of the Stipulation that Willis produce copies of tax returns and payment remittances. What she appeared to have been bargaining for

---

interest in all machinery, equipment, furniture and fixtures, accounts receivable and inventory. In view, however, of Willis' commitment under the Stipulation to transfer all the personal property belonging to Kato, subject only to the three named liens, the Court doubts that this would

have proved an obstacle had the loan otherwise been available, since Willis probably could have been required to use the very substantial sums she was being paid pursuant to the Stipulation to satisfy all other liens.

in August was not necessarily reimbursement of monies she had already expended, but a protection against future demands. Conforti's insistence upon the production of documents, never mentioned when the Stipulation was dictated into the record, is scarcely consistent with his insistence that Szwarce "stands ready to abide by [its] terms".

Not only does the record fail to establish that Szwarce was able at any time prior to filing this lawsuit seeking specific performance to carry out the terms of the Stipulation, but both Willis and Szwarce are in total agreement that no performance, partial or otherwise, other than the lifting of the *lis pendens*, was ever tendered Willis at any time.

Under examination by Willis' attorney, Szwarce reluctantly admitted that no closing date was ever set:

QUESTION: Do you recall any conversation in which it was specifically stated that now you have the Small Business Administration commitment, you were ready, willing and able to close as you say within one week?

Was there such a conversation that you know of?

ANSWER: Not specifically. When Mr. Conforti advised me we have the commitment, he said we will go ahead and close.

QUESTION: Did he tell you when you were going to go ahead and close?

ANSWER: I don't recall. As soon as possible.

(Tr. 6/13/86, pp. 94–95).

He was pressed as to whether Willis had been told he was ready to close:

QUESTION: To your knowledge, did Mr. Conforti ever give written notice to Ms. Willis directly or through her attorney that you were ready, willing and able to close and setting a specific date?

ANSWER: Not directly. I just took it for granted that he was proceeding with it as expeditiously as possible.

QUESTION: To your knowledge, was a closing date ever scheduled, don't look at Mr. Conforti with that, please.

ANSWER: I don't recall the specific closing date ever being.

QUESTION: All right.

THE COURT: Ever being what?

THE WITNESS: Every being set.

(Tr. 6/13/86, pp. 95–96).

True, he blamed the failure to set a closing date on Willis, but the fact remains that no tender was ever made.

Willis, likewise, testified that no closing date had ever been set:

QUESTION: To your knowledge, Ms. Willis, was a fixed closing date ever set by Mr. Szwarce, either directly or through Mr. Conforti or the Peconic Bank, or any other person involved in the mortgage financing?

ANSWER: No closing date was ever set.

QUESTION: To your knowledge, Ms. Willis, was any demand may by Mr. Szwarce, either directly or through Mr. Conforti, or any other representatives that you close and attend at a time and place to deliver a deed?

ANSWER: No.

(Tr. 6/13/86, pp. 121–122).

■ While Willis had earlier testified that she had refused in January to attend a "closing", the correspondence between Willis' lawyer and Conforti shows that what Conforti was proposing, even as late as January, 1985, was not the performance called for by the Stipulation, but "that the parties get together for a meeting some evening next week." (DX W). The proposal of a meeting in January to discuss problems relating to a stipulation hammered out in August, calling for performance no later than September 20th, does not qualify as either performance or a tender of performance.

Indeed, the time for performance had long since expired by January, 1985. As noted earlier, Szwarce's attorney argues strenuously that because of the nature of the contract, time was not of the essence and, therefore, Szwarce was not necessarily in default because he failed to perform either within the original 45 days or within the numerous extensions given by Willis.

He further contends that time not being of the essence, Willis failed to give clear, distinct and unequivocal notice of the date by which performance would not be acceptable.

Whether time is of the essence is a question of fact to be determined by reference to all the surrounding conditions. The conventional formulation is that time is of the essence "where the subject of the sale has a fluctuating value, or where the object of the contract is a commercial enterprise, or the delay in completion would involve one of the parties in a serious loss". *Hun v. Bourdon*, 57 A.D. 351, 354, 68 N.Y.S. 112 (1909).

In arguing that time was not of the essence for performance of the August 6th Stipulation, Szwarce relies on cases involving sales of real estate. But while the August 6th Stipulation, if carried out, would have ended in the transfer of the real estate on which the restaurant business was situated, what was involved here was not a simple sale of real estate but a change in the ownership and accompanying liabilities of an ongoing commercial enterprise. The Peconic Bank's loan officer described the transaction as involving "the sale of an existing business. The business was there. The purchase was including equipment and inventory, and furniture, and fixtures, and such as opposed to somebody buying a building that was vacant or used as a clothing store prior to that and opening up a restaurant business". (Tr. 6/11/86, p. 66).

■ In this case, all the surrounding circumstances made performance within 45 days a significant part of the total contract. The Stipulation committed Willis to continuing payments on the outstanding mortgages representing an outlay of nearly $3,100 a month, which it was anticipated she would recover from the operations of the restaurant. That is clearly why the Stipulation provided that the profits from the restaurant were to be hers until the deal closed. But starting Labor Day, the restaurant would increasingly become a lia-

bility rather than an asset so that each month of delay would be to her prejudice.

Furthermore, Willis, because of the terms of sale covering her residence, could incur an ever growing liability to the buyer the longer the delay. Also, if the transfer were not concluded in 1984, she would necessarily lose the benefit of the capital loss to offset the capital gain on the sale of her residence. In consequence of all these facts, performance in January, 1985 was worth substantially less than performance in September, 1984.

Conforti argues that if Willis wished time to be deemed of the essence, she should have spoken up when he set forth the terms of the Stipulation in open court. (Tr. 6/13/86, p. 153) But any ambiguity in the terms of the Stipulation should be resolved against Conforti, since he undertook to put those terms on the record.

Finally, the behavior of the parties is inconsistent with Szwarce's present contention that the 45 days imposed no deadline. If it did not, he would have had no occasion to request and receive, as he repeatedly did, extensions of that period.

■ Even if Szwarce were correct in arguing that time was not of the essence when the Stipulation was first made, the letter of Willis' attorney dated November 15, 1984 fixed a period for performance. On that date he wrote that Willis was willing to extend the time up to and including November 21st, after which the matter would be returned to the calendar for trial. That was as clear and unequivocal a notice as the cases require to fix a cut-off date.

But even assuming time not to have been of the essence, and the November 15, 1984 letter insufficient to fix a time, performance had to be tendered within a reasonable period. *Hadcock Motors Inc. v. Metzger, supra.* What constitutes a reasonable period is to be determined by the surrounding facts. On the facts of this case, a reasonable period expired long before November 21, 1984.

■ At the very least, performance had to be tendered before resort to the

courts. As previously noted, the record is clear that performance was not tendered at any time prior to May 5, 1985, when Szwarce brought the complaint this court has now tried. He, therefore, is not now entitled to specific performance. That due to the appreciation of the value of Bridgehampton property, Szwarce may now be able to perform is not critical. One seeking specific performance must show the ability to perform and performance at the time of the other party's claimed breach, not months later.

■ There remains Szwarce's contention that if he is not entitled to specific performance under the August 6th Stipulation, he has the right to try the original cause of action which that Stipulation settled. Indeed, the Stipulation itself provided that the only consequence of a failure of performance would be resumption of the trial to which the Stipulation had put an end. Nevertheless, this Court concludes that the right to revive the trial was lost when Szwarce elected instead to enforce the Stipulation. In exchange for Willis' promise to transfer various valuable assets to Szwarce, he not only promised certain performance in the future, himself, but also agreed not to press his pending lawsuit against her. When, in his view, she breached that agreement, he could have revived his original lawsuit; instead he elected to hold her to her contract. Having failed to demonstrate his right to do so, because he, not she, was in breach, he is not free to resume his original lawsuit. To permit him to do so would deprive Willis of the benefit of her bargain.

■ The Stipulation can be deemed either an executory accord or a superseding agreement. The result is the same. An executory accord is an agreement embodying a promise to accept at some future time a stipulated performance in satisfaction in whole or in part of a present claim or cause of action, contract or obligation. New York's General Obligation Law 15–501 (which is controlling in this case brought to enforce rights under New York law) provides that in the event of the breach of an executory accord, the wronged party has the right either to assert his rights under the original contract, or under the accord, but not both.

■ The law is equally clear if the agreement is viewed as a superseding agreement, which is the preferred construction of a settlement reached in open court. *Langlois v. Langlois*, 5 A.D.2d 75, 78, 169 N.Y.S.2d 170, 174 (3d Dept. 1957); *Goldbard v. Empire State Mutual Insurance Co.*, 5 A.D.2d 230, 234, 171 N.Y.S.2d 194, 200 (1st Dept. 1958); *Skosberg Construction Co. v. Hawthorne Industrial Park, Inc.*, 94 A.D.2d 766, 767, 462 N.Y.S.2d 711, 712 (2d Dept.1983). A superseding agreement is binding and enforceable on the parties and their rights and obligations are measured by its terms. *Protective Closures Co., Inc. v. Clover Industries, Inc.*, 394 F.2d 809, 812 (2d Cir.1968). "A settlement agreement by definition should end litigation". Judges "cannot monitor the disintegration of a cause of action by bits and pieces". *Wood v. Virginia Hauling Co.*, 528 F.2d 423, 425 (4th Cir.1975).

Szwarce, having sought to enforce the contract, which was the price he exacted for the settlement of his claim against Willis, and having been unable to do so because of his own default, cannot now revive his superseded claim. As Szwarce's attorney notes, the doctrine of election of remedies is designed to put an end to vexatious litigation, of which this has all the hallmarks.

## CONCLUSIONS OF LAW

■ At no time prior to the initiation of his state court proceeding to compel specific performance by Willis, did Szwarce tender performance himself.

At no time prior to the initiation of his state court proceeding to compel specific performance by Willis, was Szwarce in a position to carry out the terms of the Stipulation which he is now seeking to enforce.

Prior to the time Szwarce initiated his state court proceeding to compel specific performance by Willis, he had defaulted on

that Stipulation by not having timely performed.

Szwarce's failure to perform has prejudiced Willis, and has resulted in a change in her conditions and circumstances to her financial detriment, precluding specific performance at the present time, even if it were otherwise available.

Szwarce, having elected to seek specific performance of the Stipulation in lieu of restoring the prior state court action to the trial calendar for trial has made a binding election of remedies.

Upon the foregoing Findings of Fact and Conclusions of Law, judgment is granted in favor of the plaintiff, Barbara Willis, and against the defendant, Stefan Szwarce:

(a) denying Szwarce the relief requested by him in the complaint filed on May 3, 1985 in the Supreme Court of the State of New York;

(b) dismissing such complaint, with costs and disbursements, as authorized and allowed pursuant to the New York Civil Practice Law and Rules; and

(c) granting judgment in favor of Willis and against Szwarce upon the complaint in this adversary proceeding adjudging that Szwarce has no right, title, claim or interest in the School Street property or in the property of Kato.

Settle judgment.